Filed 2/15/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| G COMPANIES MANAGEMENT, LLC, Cross-complainant and Appellant, v. LREP ARIZONA LLC, Cross-defendant and Respondent. | G060992 (Super. Ct. No. 30-2017-00959639) O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Nathan R. Scott, Judge. Reversed and remanded.

Grant, Genovese and Baratta, David C. Grant and Marcus G. Larson for Cross-complainant and Appellant.

Finlayson Toffer Roosevelt & Lilly, Jared M. Toffer and Scott B. Lieberman for Cross-defendant and Respondent.

\*　　　\*　　　\*

G Companies Management, LLC, a California limited liability company, appeals from an order staying its cross-complaint against LREP Arizona, LLC, based on the forum selection clause in a loan agreement between the parties. The cross-complaint alleges multiple causes of action, all based on the assertion that the interest rates charged in the loan agreement were usurious under California law, and G Companies contends the trial court erred because a forum selection clause is not enforceable if doing so would deprive a California resident of the protections of our fundamental public policy.[1]

The court explained in its order that enforcement of the forum selection clause was appropriate because (1) the loan transaction was substantially related to Arizona, the chosen forum, and (2) California has a complicated relationship with usury and allows unlimited interest rates to be charged in numerous circumstances. LREP contends the court's decision was correct because the "many exceptions" to California's interest rate limits demonstrate that the prohibition of usury "is not a fundamental policy" in California. We disagree and therefore reverse.

By virtue of its inclusion in article XV, section 1, of our Constitution, and because it cannot be waived, we find that California's usury law does reflect a significant public policy. It prohibits money lending at rates higher than specified, even while recognizing numerous exceptions to those rate limitations. The complexity of the law does not imply a lack of commitment to the policy. To the contrary, such a fine-tuned approach suggests that significant effort has gone into determining the circumstances under which interest rate limitations are necessary for the protection of Californians.

---

[1] The order staying the third party cross-complaint in favor of another forum is appealable. (Code Civ Proc., § 904.1, subd. (3) [an appeal may be taken "[f]rom an order granting a motion to quash service of summons or granting a motion to stay the action on the ground of inconvenient forum"].)

If the circumstances of a loan transaction do not fit into one of the exceptions to California's interest rate limitation, and the rate charged is higher than allowed, then the transaction violates California's public policy against usury. And since California's usury law reflects a significant public policy designed to protect its citizens, our law precludes enforcement of a forum selection clause that will deprive a California resident of that protection.

LREP's contention that California's usury law will not ultimately provide G Companies with relief on its cross-complaint adds little to the analysis. The issue before us is whether G Companies is entitled to rely on the protection of California's public policy in asserting its claims, not whether those claims will ultimately prevail. We express no opinion on the latter point.

## FACTS

G Companies, a California limited liability company, approached agents of LREP, a Texas limited liability company which conducts its business in Arizona, seeking a $4 million short-term loan. In October 2015, the parties entered into a written agreement providing for a loan with a six-month term, with the first payment due after four months. The interest rate was 36 percent per annum, plus an additional 10 percent per annum in the event of a default.

The loan was secured by two parcels of real property located in San Juan Capistrano, California.[2] In addition, there were two individual guarantors of G Companies' performance. The agreement stated that LREP's remedy for G Companies' failure to make payments was "limited to seeking collection against the Property and the Guaranty (e.g., the guarantors Dr. Shui Yee Lee and Sabeth Siddique)."

---

[2] In its cross-complaint, G Companies describes this property as "63 acres of ocean view property in San Juan Capistrano." According to a G Companies witness, the property was believed to be worth in excess of $10 million.

3

The loan agreement specified the use of an escrow agent located in Arizona and stated that the loan closing would take place at the agent's office. The agreement also stated that it "shall be construed and governed by the laws of the state of Arizona without regard to conflict of laws principles. The Parties irrevocably submit to the exclusive jurisdiction of any federal or state court located within Maricopa County, Arizona over any dispute arising out of or related to this Agreement. Each party hereby irrevocably agrees that all claims with respect to such dispute or any suit, action or proceeding related thereto shall be heard and determined in such courts."

G Companies defaulted on the loan, failing to make the first payment due in February 2016. In July 2016, LREP foreclosed on the real property given as security— obtaining it for a credit bid of $315,000—leaving an unpaid loan balance of over $4.6 million.

According to an order issued by the United States District Court in Arizona, when LREP notified the two loan guarantors they would be sued to enforce the guaranties and recover the deficiency, they entered into a forbearance agreement which delayed the suit and partially waived interest. As part of the agreement, the guarantors agreed to waive all defenses to LREP's collection of the deficiency under Arizona antideficiency laws and consented to the filing of a preprepared lawsuit and a stipulated motion for entry of judgment against them in the event they defaulted on their obligations under the forbearance agreement. The guarantors subsequently defaulted on the forbearance agreement, resulting in the entry of judgment against them for the entire deficiency.

In December 2017, the guarantors sued G Companies, among others. The guarantors seek reimbursement from G Companies for the judgment obtained against them by LREP, including the interest accruing at the rates specified in the loan agreement.

G Companies, in turn, filed a cross-complaint against LREP, seeking declaratory relief, equitable indemnity and reimbursement, contribution, and equitable

4

apportionment, all based on LREP's alleged conduct of "collecting usurious interest against the Guarantor Plaintiffs (and indirectly but certainly against the Borrower G Companies as well)," which is characterized as "illegal, unconscionable, criminal and a breach of the implied covenant of good faith and fair dealing in the LREP Loan Documents."

LREP moved to dismiss or stay the cross-complaint, based upon the mandatory forum selection clause contained in the loan agreement. It argued that enforcement of the clause was not unfair or unreasonable because the chosen Arizona forum is closely tied to the transaction, the parties are sophisticated, and they agreed to it.

G Companies opposed the motion, arguing that California law precludes enforcement of the forum selection clause because to do so would deny a California resident the protection of California's fundamental public policy regarding usury, which is not available to them under Arizona law.

The court granted the motion, ordering a stay of the cross-complaint pending resolution of the claim in a federal or state court in Arizona. The court found that G Companies "has not met its burden to show enforcement would be unreasonable or unfair," and that the evidence showed a "reasonable relationship between the [chosen Arizona] forum and the transaction."

The trial court rejected G Companies' assertion that enforcing the forum selection clause would violate California's public policy against usury. The court apparently concluded California's usury law is too riddled with exceptions to reflect any significant public policy about interest rate limitations, identifying *Ury v. Jewelers Acceptance Corp.* (1964) 227 Cal.App.2d 11, 20 (*Ury*) and *Hyundai Securities Co., Ltd. v. Lee* (2015) 232 Cal.App.4th 1379, 1391 (*Hyundai Securities*) as the cases which "most clearly" state California's "fundamental policy . . . with respect to usury."

In *Ury,* the court stated that California's usury law does not reflect a strong public policy because the constitutional provisions exempt various classes of lenders and

5

allows the Legislature to set different interest limits for the exempted lenders. (*Ury, supra*, 227 Cal.App.2d at p. 20.) *Hyundai Securities*, in turn, cites *Ury* for the proposition that "'California does not have such a strong public policy against any and all contracts which would be usurious if they were made and to be performed here . . . .'" (*Hyundai Securities, supra*, 232 Cal.App.4th at p. 1391.)[3]

The court also cited *Mencor Enterprises, Inc. v. Hets Equities Corp.* (1987) 190 Cal.App.3d, 432, 440 (*Mencor*), for the proposition that "California does not have a strong public policy against enforcing contracts valid under chosen law but usurious under California law . . . ."

## DISCUSSION

G Companies contends the court erred by enforcing the forum selection clause because California law prohibits such enforcement if the result would be to deny a California resident of the benefits of our fundamental public policy; and in this case, the claims it sought to litigate are based on California's constitutional prohibition against usury.

LREP counters by asserting the trial court correctly determined that California's usury law does not reflect a significant public policy against charging high interest rates under the circumstances presented here, and thus the burden remained with G Companies to demonstrate it would be unfair or unreasonable to enforce the forum

---

[3]     *Hyundai Securities* does not involve a motion to enforce a forum selection clause. It concerns the enforcement of an existing Japanese judgment under California's Uniform Foreign-Country Money Judgments Recognition Act (Code Civ. Proc., §§ 1713-1725; the Act). The court concluded the existing Japanese judgment, which incorporated a 20 percent postjudgment interest rate allowed under Japanese law, was required to be recognized as a valid foreign country money judgment under the Act, but upon entry as a California judgment, the 20 percent rate would no longer be applied. Instead, the California judgment would accrue postjudgment interest at the 10 percent rate allowed under California law.

6

selection clause in this case, which it failed to do. LREP also argues that California's usury law would not entitle G Companies to any relief even if this case remains in California.

We address each of these contentions in turn.

1.      *Enforcement of Forum Selection Clauses*

"California favors contractual forum selection clauses so long as they are entered into freely and voluntarily, and their enforcement would not be unreasonable. [Citation.] This favorable treatment is attributed to our law's devotion to the concept of one's free right to contract, and flows from the important practical effect such contractual rights have on commerce generally." (*America Online, Inc. v. Superior Court* (2001) 90 Cal.App.4th 1, 11 (*America Online*).)

However, "California courts will refuse to defer to the selected forum if to do so would substantially diminish the rights of California residents in a way that violates our state's public policy." (*America Online, supra*, 90 Cal.App.4th at p. 12; see *Intershop Communications AG v. Superior Court* (2002) 104 Cal.App.4th 191, 200 ["a forum selection clause will not be enforced if to do so would bring about a result contrary to the public policy of this state"].)

As explained in *Verdugo v. Alliantgroup, L.P.* (2015) 237 Cal.App.4th 141, 147, "[t]he party opposing enforcement of a forum selection clause ordinarily 'bears the "substantial" burden of proving why it should *not* be enforced.' [Citations.] That burden, however, is reversed when the claims at issue are based on unwaivable rights created by California statutes. In that situation, the party seeking to enforce the forum selection clause bears the burden to show litigating the claims in the contractually designated forum 'will not diminish in any way the substantive rights afforded . . . under California law.'" (See *America Online, supra,* 90 Cal.App.4th at p. 10 [party seeking enforcement must "prove that enforcement of the forum selection clause would not result in a significant diminution of rights"].)

In *Hall v. Superior Court* (1983) 150 Cal.App.3d 411 (*Hall*), this court refused to enforce a forum selection clause in a case in which two California investors had exchanged their interests in an oil and gas limited partnership in return for stock in one of their co-investors, a Utah corporation. As in this case, the parties in *Hall* agreed to both forum selection and choice of law provisions, which identified Nevada as the selected forum and chose its laws to govern the transaction. Although the trial court enforced the forum selection clause, this court reversed.

We explained in *Hall* that "[w]hile 'California does not have any public policy against a choice of law provision, where it is otherwise appropriate' [citation] . . . [citation], 'an agreement designating [a foreign] law will not be given effect if it would violate a strong California public policy . . . [or] "result in an evasion of . . . a statute of the forum protecting its citizens."'" (*Hall, supra*, 150 Cal.App.3d at pp. 416-417.) We then reasoned that if the pending litigation were transferred to Nevada where Nevada law would be applied, the investors would lose the benefit of California's Corporate Securities Law of 1968 (Corp. Code, § 25000 et seq.), which would otherwise govern the exchange. The investors would thus be denied California's unwaivable protections against fraud and deception in securities matters. (*Hall, supra*, 150 Cal.App.3d at p. 417.) Consequently, the trial court erred by enforcing the provision.

2.     *California's Policy Against Usury*

Usury in California is addressed in California Constitution, article XV, section 1, which sets interest rates, with exceptions. As explained in *Bisno v. Kahn* (2014) 225 Cal.App.4th 1087, 1098, "The usury law is based upon article XV, section 1 of the California Constitution as well as an initiative measure adopted in 1918. [Citations.] The initiative measure has not been codified but is published in Statutes and Amendments to the Codes and [West's Annotated] Civil Code. [Citations.] The initiative measure remains in full force and effect except to the extent it conflicts with the constitutional usury provision. [Citations.] We refer to the constitutional and initiative

8

provisions collectively as the 'usury law.'"[4] (See Civ. Code, § 1916-5 ["This act whenever cited, referred to, or amended may be designated simply as the 'usury law'"]

Article XV, section 1, of the California Constitution states that "[n]o person, association, copartnership or corporation shall by charging any fee, bonus, commission, discount or other compensation receive from a borrower more than the interest authorized by this section upon any loan or forbearance of any money, goods or things in action."

Civil Code section 1916-2 specifies that if an agreement or contract contains a provision requiring interest in excess of the allowable rate, it "shall be null and void as to any agreement or stipulation therein contained to pay interest and no action at law to recover interest in any sum shall be maintained and the debt can not be declared due until the full period of time it was contracted for has elapsed."

And Civil Code section 1916-3, subdivision (a), provides "[e]very person . . . who for any loan or forbearance of money, goods or things in action shall have paid or delivered any greater sum or value than is allowed to be received under [the initiative provisions] may either in person or his or its personal representative, recover in an action at law against the person . . . who shall have taken or received the same . . . treble the amount of the money so paid or value delivered in violation of [those provisions]. . . ."

The purpose of the usury law is "'to protect the necessitous, impecunious borrower who is unable to acquire credit from the usual sources and is forced by his

---

[4] As noted above in *Bisno*, the *uncodified* initiative measure is published in Statutes and Amendments to the Codes. (See Stats. 1919, pp. lxxxiii-lxxxiv, §§ 1-5.) Further usury law references in this opinion are to West's designation of the initiative as sections 1916-1 to 1916-5 of the Civil Code. (See 10 West's Ann. Civ. Code (2022 ed.) foll. § 1916.12, pp. 71-128.) For example, section 5 of the measure is cited herein as Civil Code section 1916-5.

9

economic circumstances to resort to excessively costly funds to meet his financial needs.'" (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 804-805 (*Ghirardo*).)

Our usury law does not set ironclad limitations on allowable interest rates. It allows different interest rates to be charged in different circumstances and exempts large categories of lenders while giving our Legislature the power to impose limitations on the exempt lenders.[5] (Cal. Const., art XV, § 1.) The law's complexity has prompted our Supreme Court to remark that "the usury law is . . . riddled with so many exceptions that the law's application itself seems to be the exception rather than the rule." (*Ghirardo, supra,* 8 Cal.4th at p. 807.)

That may be true, but the inclusion of the usury law in our Constitution reflects it involves an important public policy. (*Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 892 ["the California Constitution amply established the existence of a fundamental public policy"]; see *Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 71 ["aside from constitutional policy, the Legislature, and not the courts, is vested with the responsibility to declare the public policy of the state"].)

We find it significant that the protections of our usury law cannot be waived. (*WRI Opportunity Loans II, LLC v. Cooper* (2007) 154 Cal.App.4th 525, 542-543 [because a usurious provision is void under California law, the prohibition against usury cannot be waived].) A public policy that cannot be waived qualifies as fundamental. (*Brack v. Omni Loan Co., Ltd.* (2008) 164 Cal.App.4th 1312, 1323 ["The relative significance of a particular policy or statutory scheme can be determined by considering whether parties may, by agreement, avoid the policy or statutory

---

[5]    "The Legislature may from time to time prescribe the maximum rate per annum of, or provide for the supervision, or the filing of a schedule of, or in any manner fix, regulate or limit, the fees, bonuses, commissions, discounts or other compensation which all or any of the said exempted classes of persons may charge or receive from a borrower in connection with any loan or forbearance of any money, goods or things in action." (Cal. Const., art XV, § 1.)

requirement"]; see *America Online, supra*, 90 Cal.App.4th at p. 15 ["enforcement of AOL's forum selection clause, which is also accompanied by a choice of law provision favoring Virginia, would necessitate a waiver of the statutory remedies of the CLRA, in violation of that law's antiwaiver provision"].)

Our usury law protects sophisticated borrowers as well as unsophisticated ones. (*Ghirardo, supra*, 8 Cal.4th at p. 807 ["There is . . . no exemption in the usury law for sophisticated borrowers. We decline to create one"].)

In arguing that our usury law does not qualify as an important public policy, LREP (and apparently the trial court as well) rely on *Ury, Hyundai Securities* and *Mencor*. *Ury*, posits that California's usury law does not reflect a strong public policy because of the many exemptions in the constitutional provision and because it allows the Legislature to set different interest limits for the exempted lenders. The court explained its belief that "[a] strong public policy, based on a settled concept of justice or morality would not be meshed with such alterable rates as the Legislature might choose to impose." (*Ury, supra*, 227 Cal.App.2d at p. 20.)

We disagree as we cannot see how "settled concept[s] of justice or morality" could create a public policy that is inconsistent with California's Constitution or legislative enactments. (*Ury, supra*, 227 Cal.App.2d at p. 20.) California's public policy is established by the provisions of our Constitution and (where allowed by the Constitution) such laws as our Legislature chooses to enact. (*Green v. Ralee Engineering Co., supra*, 19 Cal.4th at p. 71 ["[A]side from constitutional policy, the Legislature, and not the courts is vested with the responsibility to declare the public policy of the state"].)

*Hyundai Securities*, as we have noted (see footnote 3, *infra*), concerns the enforcement of a foreign judgment under the provisions of the Act, rather than the enforcement of a forum selection clause. In concluding that a 20 percent rate of interest incorporated into a Japanese judgment is not "repugnant to the public policy of this state" as that term is used in the Act, the court relies on *Ury* for the proposition that "'California

11

does not have such a strong public policy against any and all contracts which would be usurious if they were made and to be performed here . . . .'" (*Hyundai Securities, supra*, 232 Cal.App.4th at p. 1391.) It does not separately analyze the point. As a result, we find *Hyundai Securities* unpersuasive.

*Mencor* likewise cites *Ury* without analysis. In doing so, the court also ignored its own earlier pronouncement that "'California has a strong public policy against usury, that is, the charging and receiving interest on the loan or forbearance of money in excess of the rate allowed by law.'" (*Mencor, supra*, 190 Cal.App.3d at p. 440, quoting *Gamer v. duPont Glore Forgan, Inc.* (1976) 65 Cal.App.3d 280, 287.)

A policy's complexity does not suggest to us that policy is insignificant; in fact, the attention to detail implies just the opposite. Indeed, if a complex set of rules undermined the significance of the resulting public policy, the same analysis would undermine the legitimacy of our well-established policies regarding privilege, negligence, intestate succession, consumer protections, insurance law, and homicide, to name just a few areas of concern.

Finally, *Mencor* involves a challenge to an order sustaining a demurrer to the complaint, without leave to amend, based on a choice of law provision; it does not consider the propriety of enforcing a forum selection clause. The appellate court held in *Mencor* that the propriety of the choice of law provision—specifying that Colorado law would be applied—could not be decided as a matter of law on demurrer; thus the court reversed the trial court's order sustaining the demurrer to the plaintiff's usury claim under California law. (*Mencor, supra*, 190 Cal.App.3d at pp. 440-441.)

*Mencor*, like *Hyundai Securities* and *Ury*, fails to persuade us that the unwaivable usury law enshrined in our Constitution reflects something other than a fundamental public policy of this state. Instead, we agree with the conclusion in *Gamer v. duPont Glore Forgan, Inc., supra*, 65 Cal.App.3d at p. 287, that while California "has no strong public policy against *a particular rate of interest* so long as the charging of that

12

rate is permitted by law to the specific lender," it "*has a strong public policy against usury*, that is, the charging and receiving interest on the loan or forbearance of money *in excess of the rate allowed by law*." (Italics added.) We therefore conclude the trial court abused its discretion when it concluded California's usury law does not reflect a fundamental public policy.

        3.      *The Cross-Complaint's Invocation of California's Usury Law*

G Companies' cross-complaint is based on the theory that because the parties' loan agreement violated California's usury law, and G Companies would be entitled under California law to recover any such illegal interest it had paid to LREP pursuant to the agreement (Civ. Code, § 1916-3), it should also be allowed to obtain indemnity or reimbursement from LREP for any such interest it might be obligated to pay to the guarantors if they prevail against G Companies on their complaint. This cross-complaint therefore invokes the protection of California's policy against usury.

The burden was therefore on LREP to show that enforcing the forum selection clause "'will not diminish in any way the substantive rights afforded . . . under California law.'" (*Verdugo v. Alliantgroup, L.P., supra*, 237 Cal.App.4th at p. 147; *America Online, supra*, 90 Cal.App.4th at p. 10 [party seeking enforcement must "prove that enforcement of the forum selection clause would not result in a significant diminution of rights"].)

LREP failed to carry its burden. Instead, LREP argues that the "usury law G Companies[] invokes (California Civil Code section 1916-2) does not even apply to this cross-claim." LREP points out that while Civil Code section 1916-2 would preclude it from maintaining an action in California against G Companies to recover the illegal interest payable under the agreement, it has not done so, and therefore its actions could not have violated the protection offered to G Companies under the cited provision.

But G Companies' cross-complaint is not based solely on the provisions of Civil Code section 1916-2. Instead, it invokes the broader protections of our usury law,

citing California Constitution, article XV, section l, as well as Civil Code §§ 1916-2 and 1916-3 in support of its claims. Enforcing the forum selection clause, and requiring this cross-complaint to be litigated in Arizona, would preclude G Companies from relying on those provisions in pursuing its claims.[6]

    4.    *The Equities*

Finally, LREP argues that forum non conveniens is an equitable doctrine, and thus enforcement of the forum selection clause was proper as long as the equities favor a transfer of the cross-complaint to Arizona. When we are considering the enforcement of a forum selection clause that would deprive a California resident of the protections of a fundamental public policy, we do not engage in that weighing process.

In any event, it would not change the result if we did. LREP argues G Companies is a sophisticated borrower; it was represented by counsel; and it freely agreed to the terms of the loan agreement—including the extraordinary interest rates: "This is hardly a situation where a California consumer was duped into a usurious interest rate by a sharp operator. G Companies is not the type of 'unwary and necessitous' borrower that California's usury laws were 'designed to protect.'" But as we have already pointed out, neither G Companies' level of sophistication, nor its willingness to agree to the excessive interest rates are germane to the question of whether this loan transaction is enforceable in the face of California's usury law.

---

[6]    We acknowledge the trial court's suggestion that enforcement of the forum selection clause is beside the point because the real issue is which state's *law* would be applied: i.e., the contractual choice of law provision. The court pointed out that "[e]ither court may make a choice-of-law determination: Arizona courts sometimes apply California law; California courts sometimes apply Arizona law. Which law governs this loan is a distinct inquiry from which court should make that decision." We cannot agree. It is true that states sometimes apply the laws of other states, but they generally do so because the parties have agreed to it. If this cross-complaint were litigated in Arizona, there is no reason to suspect Arizona would apply California's usury law to the dispute.

14

Our usury law protects "'the necessitous, impecunious borrower who is unable to acquire credit from the usual sources and is forced by his economic circumstances to resort to excessively costly funds to meet his financial needs.'" (*Ghirardo, supra*, 8 Cal.4th at pp. 804-805.) Such borrowers are, by definition, the most likely to default on their obligations.

Finally, we reject LREP's suggestion that the timing of G Companies' cross-complaint demonstrates it is "tactical and improper." The argument is unsupported by any citation to the record. But even if it were true that G Companies declined to voluntarily insert itself into earlier litigation between LREP and the guarantors, and then delayed as long as possible before pursuing its cross-complaint against LREP, that choice would not be presumptively nefarious. Parties often fail to object when they are left out of litigation, and they delay as long as they can before taking affirmative action in a case where they are defendants.

We are then left with a final argument: LREP's assertion that "the courts in Maricopa County are already familiar with the underlying transactions and are available and able to address any claims relating to the loan transaction." Again, LREP cites no facts in the record to support this assertion. And the documents in our record do not appear to support that contention. As we have already noted, the documents from the United States District Court in Arizona suggest the merits of the loan transaction were never actually addressed in the prior case between LREP and the guarantors. Instead, those documents reflect that the court in Arizona considered only the litigation forbearance agreement entered into between those parties, as well as the stipulation for entry of judgment that became effective after the guarantors defaulted under that forbearance agreement. It also appears the district court completed its work in early 2020.

By contrast, the trial court here has apparently presided over litigation related to the merits of the loan transaction, and it will continue to do so without regard to

15

what happens with G Companies cross-complaint.  Thus, requiring the cross-complaint to be separately litigated in Arizona would not seem to promote efficiency, as LREP implies.  We therefore reject LREP's contention that the "equities" favor enforcement of the forum selection clause.

## DISPOSITION

The order staying G Companies' cross-complaint is reversed, and the case is remanded to the trial court for further proceedings.  G Companies is entitled to its costs on appeal.


GOETHALS, J.

WE CONCUR:


O'LEARY, P. J.


MOTOIKE, J.

16